UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| **VERSUS** | **NO: 21-179** |
| **MARK S. GRELLE** | **SECTION "H"** |

### ORDER AND REASONS

Before the Court is Defendant Mark Grelle's Rule 29 Motion for Judgment of Acquittal (Doc. 184). Oral argument was held on July 19, 2023. For the following reasons, the Motion is **DENIED**.

### BACKGROUND

In November 2022, Defendants Glenn Diaz, Peter Jenevein, and Mark Grelle were charged in a 31-count Superseding Indictment with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349; conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h); and bank fraud in violation of 18 U.S.C. § 1344(2).[1] After a seven-day jury trial, Defendant Grelle was found guilty of both conspiracy charges and 16 counts of bank fraud. Grelle now moves for acquittal on all counts.

---

[1] *See* Doc. 98. Diaz and Jenevein were charged in each of the 31 counts of the Superseding Indictment, and Grelle was charged in 20 of the counts. Count 1 charged all three Defendants with conspiracy to commit bank fraud. Count 2 charged all three Defendants with conspiring to commit money laundering. In Counts 3 through 31, Diaz and Jenevein were charged with bank fraud, and Grelle was also charged in Counts 3 to 6, 11, 14, 15, 18 to 25, and 28 to 30.

1

The evidence presented at trial revealed the following. Glenn Diaz was a customer of First NBC Bank ("FNBC" or "the Bank"), a federally insured financial institution, from approximately 2006 until its closure in 2017. Pete Jenevein was personal friend and employee of Diaz. Mark Grelle was also a friend of Diaz and owned St. Bernard Underground Services, a business that performed directional boring services.

Despite being asset-rich, Diaz claimed to be cash-poor, and managed many of his personal and business expenditures by overdrafting his FNBC checking account. By 2015, Diaz had overdrafted his account by almost one million dollars; these overdrafts were approved by FNBC president Ashton Ryan. Because Diaz's overdrafts were often checks issued to himself, which he deposited in his Trustmark Bank account, FNBC had no visibility into the sources of the expenses. As a result, by June 2016, Ashton Ryan and Loan Officer Bill Bennet informed Diaz that, in order to monitor how Diaz was spending its funds, all checks were required to be supported by itemized expenses for a Florida warehouse, Diaz's property that served as the Bank's collateral.[2] FNBC also required Diaz to issue all checks to the end recipient, and not to Diaz himself.[3]

---

[2] On June 7, 2016, Bennett instructed Diaz and Jenevein that "there are no other funds available for further checks," and asked them to "[p]lease stop writing checks on the First NBC account." Government Ex. 25. Bennett also explained that "[i]n order to move forward, I need more information from you," and delineated the requirements that had to be satisfied before the Bank would fund future overdrafts and loans, including a "detailed breakdown of expenses you project in order to make the Florida property ready for the new tenant." *Id*. On June 13, 2016, Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36.

[3] On June 13, 2016, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id*. The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id*.

Because Jenevein was responsible for managing Diaz's properties, including the Florida warehouse, through the rest of 2016, Jenevein emailed invoices and lists of expenses to Bennett, copying Diaz.[4] Based on these representations, the Bank permitted Diaz to overdraft his account, which Bennett explained was tantamount to an unsecured loan.[5] Loans were subsequently made by the Bank to cover the overdrafts "created by repairs to [Diaz's] warehouse in Lynn Haven, FL."[6] At trial, the evidence revealed that Diaz did not actually spend the Bank's money on his Florida warehouse, as he represented. Rather, Diaz was able to obtain these funds through a scheme that involved submitting fabricated invoices and financial documents to the Bank with the help of Jenevein and Grelle.

The scheme essentially involved two parts. First, Jenevein and Grelle fabricated invoices that falsely represented that Grelle Underground Services LLC, a company owned by Grelle, performed services at Diaz's Florida warehouse. Jenevein then emailed the fake invoices to Bennet, copying Diaz. Based on these invoices, the Bank distributed the funds to Grelle, who ultimately funneled the money back to Diaz while keeping a portion for himself. These circular transactions occurred a total of 17 times and formed the basis for 17 counts of bank fraud, as well as conspiracy to commit bank fraud and conspiracy to commit money laundering.

The second part of the scheme also involved submitting false information to the Bank. Instead of circular transactions conducted with Grelle Underground Services, Jenevein sent the Bank fake invoices from other companies, payroll for purported Diaz employees, and bogus credit card itemizations. Based on these representations, the Bank distributed the funds.

---

[4] *See* Government Exs. 22, 23.
[5] *See* Government Ex. 24.
[6] Government Ex. 78. *See also* Government Exs. 1001–05.

The costs reflected in these documents, however, were inflated, not incurred, or for other expenses unrelated to maintaining Diaz's Florida warehouse.

## LEGAL STANDARD

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may move for a "judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."[7] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[8] To this end, the court must "review the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict."[9] The court is "concerned only with whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[10]

## LAW & ANALYSIS

### A. Conspiracy to Commit Bank Fraud and Bank Fraud

Count 1 of the Superseding Indictment charged Defendants with conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344(2) and 1349. Counts 3 to 6, 11, 14, 15, 18 to 25, and 28 to 30 charged Defendants with bank fraud in violation of 18 U.S.C. § 1344(2). As to bank fraud conspiracy, the Government was required to prove beyond a reasonable doubt that: (1) "the defendant and at least one other person agreed to commit the crime of [bank fraud]"; and (2) "the defendant knew the unlawful purpose of the agreement

---

[7] FED. R. CRIM. P. 29.
[8] Jackson v. Virginia, 443 U.S. 307, 319 (1979).
[9] United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008) (internal quotations omitted).
[10] *Id.* (internal quotations omitted).

4

and joined in it willfully, that is, with the intent to further the unlawful purpose."[11] To secure a conviction on bank fraud, the Government was required to prove beyond a reasonable doubt that: (1) "the defendant knowingly executed a scheme or artifice"; (2) "the scheme or artifice was executed to obtain money or other property from a financial institution"; (3) "the scheme or artifice was executed by means of false or fraudulent pretenses, representations, or promises"; and (4) "the false or fraudulent pretenses, representations, or promises were material."[12]

Grelle argues that he should be acquitted of bank fraud because the Government failed to carry its burden of proof as to any element. The Court disagrees. At trial, the Government presented evidence that the Defendants acted in concert to submit false invoices to FNBC. These documents were submitted as "proof" of expenses incurred in improving Diaz's Florida warehouse, a property that served as the Bank's collateral. Based on these documents, FNBC authorized Diaz to issue checks that overdrew his account. Seventeen of these checks were written directly to Grelle, who then funneled money through his Regions bank accounts before transferring it back to Diaz.

Specifically, emails between Grelle and Jenevein revealed the two collaborating to create invoices for work purportedly, though not actually, performed by "Grelle Underground Services." Sometimes Jenevein advised Grelle on what to include in his own Grelle Services invoices, which is incongruous with the typical customer-contractor relationship.[13] Other times, Grelle helped Jenevein craft invoices. One email shows Grelle instructing

---

[11] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019). *See also* United States v. Pascacio-Rodriguez, 749 F.3d 353, 363-64 (5th Cir. 2014) (stating that, unlike conspiracy under 18 U.S.C. § 371, fraud conspiracy under § 1349 does not require an overt act).
[12] Pattern Crim. Jury Instr. 5th Cir. 2.58B (2019).
[13] *See* Government Ex. 494 (Jenevein emailing Grelle information for "Invoice ceiling tiles an[d] insulation").

Jenevein to "break each i[t]em down by cost 5 double glass doors how many how much,"[14] and another email reveals Grelle telling Jenevein, "This will work looks better."[15] Correspondence also showed Grelle and Jenevein backdating invoices, representing that they were for services already rendered.[16] Grelle's invoices occasionally included demands that payment was "past due" or "due now," yet, Grelle ultimately returned the money to Diaz.[17]

Further, financial records showed 17 separate occasions in which Diaz wrote FNBC checks to Grelle, who then deposited them into his Regions account before transferring the funds back.[18] The fact that these circular transactions occurred 17 times indicates a regularized, coordinated pattern of activity.[19] Based on Grelle's participation in fabricating invoices followed by his depositing and moving FNBC funds, a rational jury could determine that Grelle knowingly engaged in a scheme to obtain money from FNBC by means of false statements.

Finally, Grelle avers that the evidence is insufficient to show that he exposed FNBC to a risk of civil liability or financial loss. The offense charged in this case, however, does not require proof that a defendant's scheme created

---

[14] Government Ex. 485.
[15] Government Ex. 482.
[16] *See* Government Ex. 483 (a July 12, 2016, email concerning an invoice dated June 16, 2016).
[17] *See* Government Ex. 503 (email from Jenevein to Grelle stating, "Include Due Now!!!").
[18] On July 27, 2016, for example, Jenevein emailed Grelle with the subject line "Invoice ceiling tiles an[d] insulation," giving him the date (July 12, 2016), amount ("Total $18,933.00"), and contents (such as "30 Rolls of hanging wire" and "Payment upon delivery") for the invoice. Government Ex. 494. Jenevein subsequently emailed the completed "Grelle Services" invoice to Bennett, copying Diaz and writing, "This invoice was paid today with a first nbc check. This invoice is associated with The ceiling, insulation, tracts, wire etc for metal pro warehouse office." Government Exs. 074, 074A. Grelle then deposited a check written from Diaz's FNBC account for $18,933.00 on July 28, 2023. Government Exs. 076, 334. On August 9, 2016, Grelle issued a check from his Regions account back to Diaz for $18,000, which Diaz then deposited into his personal Chase checking account. Government Exs. 333, 1023.
[19] *See* Government Ex. 1008. Any explanation that Grelle was refunding Diaz for cancelled services is contradicted by the fact that Grelle often kept a portion of the proceeds. *See id.* (summarizing that Grelle returned $330,690.80 to Diaz and kept $15,150.61).

such risks for a financial institution.[20] Defendant Grelle's motion for acquittal on these counts is denied.

## B. Conspiracy to Commit Money Laundering

Count 2 charged Defendants with conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h). Here, the government was required to prove beyond a reasonable doubt: "(i) 'that there was an agreement between two or more persons to commit money laundering'; and (ii) 'that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.'"[21] The object of the conspiracy charged in this case was concealment money laundering,[22] which required the Government to prove that: (1) "the defendant knowingly conducted [or] attempted to conduct a financial transaction" involving "the proceeds of a specified unlawful activity, namely [bank fraud]"; (2) "the defendant knew that the property involved in the financial transaction represented the proceeds of" bank fraud; and (3) "the defendant knew that the transaction was designed in

---

[20] Only 18 U.S.C. § 1344(1) requires proof that the defendant "placed the financial institution at risk of civil liability or financial loss." Pattern Crim. Jury Instr. 5th Cir. 2.58A (2019). Here, Defendants were charged under 18 U.S.C. § 1344(2). *See* Loughrin v. United States, 573 U.S. 351, 366 n.9 (2014) (explaining that exposing a financial institution to a risk of loss is not an element under § 1344(2) and that "the broad language in § 1344(2) describing the property at issue—'property owned by or under the custody or control of' a bank—appears calculated to avoid entangling courts in technical issues of banking law about whether the financial institution or, alternatively, a depositor would suffer the loss from a successful fraud.").
[21] United States v. Alaniz, 726 F.3d 586, 601 (5th Cir. 2013) (quoting United States v. Fuchs, 467 F.3d 889, 906 (5th Cir. 2006)).
[22] *See* 18 U.S.C. § 1956(a)(1)(B)(i).

whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity."[23]

Grelle argues that he should be acquitted of conspiracy to commit money laundering because the Government presented insufficient evidence to prove (1) that Grelle knowingly conducted financial transactions with the proceeds of specified unlawful activity or (2) that Grelle knew the financial transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds. The Court disagrees.

At trial, the evidence revealed that by June 2016, FNBC required all checks to be justified by invoices for the Florida warehouse and to be written to the end recipient.[24] The evidence further established that each Defendant had a unique role in conducting these circular financial transactions to avoid scrutiny by FNBC. Grelle's role involved assisting Jenevein in fabricating invoices for services purportedly, though not actually, performed by "Grelle Underground Services," and moving FNBC funds back to Diaz. Based on these falsities, FNBC permitted Diaz to write checks to Grelle, who then deposited them in his Regions bank account. The evidence showed, however, that Grelle ultimately returned the funds to Diaz to be deposited in Diaz's Chase bank account.[25]

---

[23] Pattern Crim. Jury Instr. 5th Cir. 2.76A (2019). Bank fraud is a specified unlawful activity. *See* 18 U.S.C. § 1956(c)(7) (referencing 18 U.S.C. § 1961(1)); 18 U.S.C. § 1961(1) (listing 18 U.S.C. § 1344 as an enumerated offense)).

[24] On June 13, 2016, Bill Bennett emailed Diaz, writing "I told you the bank could only consider paying checks if we had invoices to support them. We had $28k in invoices, and Ashton covered $28k in checks. I continued telling you we needed invoices to pay checks." Government Ex. 36. That same day, Ashton Ryan emailed Diaz, stating "The checks have to be to the end recipient. No more checks to yourself." *Id.* The following day, Diaz forwarded Ryan's email to Jenevein, instructing him to "[n]ever write a check to my name any more[.] Only to the end user or recipient." *Id.*

[25] In November 2016, for instance, Diaz issued a $20,507.36 check to Grelle. *See* Government Ex. 178. Jenevein and Grelle represented to FNBC that the payment was for "fabricated return pipes" for Diaz's company, MetalPro. *See* Government Exs. 172, 172A. Grelle deposited the check into his Grelle Underground Services account at Regions before transferring the

These facts establish the requisite elements of a conspiracy to commit money laundering.[26] Based on correspondence between Grelle and Jenevein in which they discuss fraudulent invoices, a rational jury could find that Grelle knew the subsequent checks were proceeds derived from "some form of unlawful activity."[27] The evidence also revealed that Grelle and Diaz opened bank accounts at other banks less than two months before the scheme began. A rational juror could infer that the conspirators opened the accounts to conceal their circular transaction scheme from FNBC by using bank accounts that FNBC could not monitor.[28] Grelle's addition of another step to the circular transactions further demonstrates his intent to conceal the source of the proceeds. For the first three transactions, Grelle deposited FNBC's funds into the Grelle Underground Services account and then wrote a check back to Diaz. By the fourth transaction, however, Grelle added a step by moving the funds from the Grelle Underground Services account to his personal Regions account before sending the funds back to Diaz.[29] A rational jury could infer a concealment purpose from this conduct.

Although there was no direct evidence of an explicit agreement to launder money, a rational jury could infer the existence of a tacit understanding from the concerted action of the Defendants.[30] The Government

---

funds to his personal account at Regions. *See* Government Ex. 1039. When Grelle issued a return check of $17,607.00 back to Diaz, he marked "#15" on the memo line, indicating that this was the fifteenth circular transaction. Government Ex. 352.

[26] *See* 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h).

[27] 18 U.S.C. § 1956(a)(1)(B)i).

[28] *See* United States v. Chavez, 951 F.3d 349, 356 (6th Cir. 2020) (explaining that "a rational juror could infer that the conspirators opened the accounts to conceal their fraudulent-billing scheme from the chiropractors by using bank accounts the chiropractors could not monitor.").

[29] *See* Government Ex. 1032.

[30] *See* United States v. Davis, 1998 WL 514156, at *3 (2d Cir. July 8, 1998) (citing United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997) (stating that a "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement")).

was not required "to prove that the alleged conspirators entered into any formal agreement, or that they directly stated between themselves all the details of the scheme."[31] Likewise, the Government was not required "to prove that all of the details of the scheme alleged in the indictment were actually agreed upon or carried out."[32] Rather, such concert of action is sufficient to prove conspiracy to commit money laundering.[33]

Finally, Grelle contends that he did not have knowledge that any financial institution was involved, as supported by the fact that no Bank officer testified that they ever communicated with him. But as the Government notes, a rational jury could interpret this fact as emphasizing Grelle's role in the money laundering scheme because having no contact with FNBC employees allowed Grelle to serve as an effective "front man" for the circular transactions.[34] Defendant Grelle's motion for acquittal on this count is also denied.

## CONCLUSION

For the foregoing reasons, Defendant Mark Grelle's Rule 29 Motion for Judgment of Acquittal (Doc. 184) is **DENIED**.

New Orleans, Louisiana, this 31st day of August, 2023.

_____
**HON. JANE TRICHE MILAZZO
UNITED STATES DISTRICT JUDGE**

---

[31] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019).
[32] *Id.*
[33] *See Davis*, 1998 WL 514156 at *3.
[34] *See* United States v. Baxter, 761 F.3d 17, 32 (D.C. Cir. 2014).